## FULKERSON & Others *v.* HOLMES & Others.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE WESTERN DISTRICT OF VIRGINIA.

Argued March 11, 1886.—Decided March 22, 1886.

n ejectment, after proving a patent of the premises from the State of Virginia. to S. Y. in 1787, the plaintiff offered in evidence a duly recorded deed from S. C. Y., his son and sole heir, to J. H., dated in 1819, proved the handwriting of the magistrate who took the acknowledgment of it and the signature of a witness who had been dead over fifty years, and showed that the patent and deed were found among the papers of J. H. after his death in 1834. *Held,* That the deed was admissible in evidence as an ancient document without further proof.

An ancient deed reciting the death, intestate, of a former owner of lands conveyed by it, and that the grantor in the deed was his only son and heir in whom title to the lands vested on his death, and conveying the lands to a person under whom the plaintiff in an action of ejectment claimed, is admissible in evidence at the trial of that action, after the lapse of over sixty years, in order to prove the pedigree of the son.

The proof in this case fails to show that the lands in controversy had become forfeited to the State of Virginia for non-listing for taxation or for nonpayment of taxes, at the time when the patents were issued under which the defendants claim title.

This was an action of ejectment. The defendants in error were the plaintiffs in the Circuit Court, and were the heirs at law of John Holmes, deceased. They brought the action in August, 1871, to recover a tract of three thousand acres of land in Lee County, in the State of Virginia. The defendants pleaded the general issue. The case was tried by a jury, and there was a verdict for the plaintiffs, on which the court

rendered judgment, and the defendants sued out this writ of error.

It appeared from the bill of exceptions that the plaintiffs, to sustain the issue on their part, offered in evidence a patent from the Commonwealth of Virginia to Samuel Young, dated May 7, 1787, for the premises in controversy, which was admitted without objection.

They next offered a deed for the same premises from Samuel C. Young to John Holmes, dated July 12, 1819. This deed recited the grant by the Commonwealth of Virginia to Samuel Young of the premises in controversy, that Samuel Young, the patentee, had died intestate, that Samuel C. Young, the grantor, was his only child and heir, and that the title to said lands had vested in him. Appended to the deed was a certificate of acknowledgment, dated July 15, 1819, at the Eastern District of Pennsylvania, purporting to have been taken by Richard Peters, United States judge for the district of Pennsylvania, and signed by him. The deed appeared also to have been witnessed by John Shaw and John Craige. Immediately after the certificate of acknowledgment appeared what purported to be the receipt of Samuel C. Young for the consideration money mentioned in the deed, which was $10,400, signed by him and witnessed by John Craige. The plaintiffs proved the handwriting of Judge Peters to the certificate, and the death of John Shaw, one of the witnesses, which took place more than fifty years before the trial. Appended to the deed was the following certificate of registration:

"Virginia: At a court begun and held for Lee County, at the court-house thereof, on the 15th day of January, 1838, this indenture of bargain and sale for land between Samuel C. Young, of the one part, and John Holmes of the other part, was admitted to record upon the certificate of Richard Peters, judge of the Pennsylvania district of the United States.

"J. W. S. MORRISON, D. C."

The deed bore the following endorsement:

"Recorded in the clerk's office of the County Court of Lee, in book No. 7, page 401.

"Teste: J W. S. Morrison, D. C."

The plaintiffs also introduced evidence tending to show that the patent to Samuel Young, and the deed from Samuel C. Young to John Holmes, were found among the papers of the latter after his death in 1834.

They also offered the testimony of John Holmes, a son-in-law of John Holmes, the grantee of the land, who testified that he knew that said grantee owned a tract of 3000 acres of land in Lee County, Virginia, and that the deed for the land was in the possession of John Holmes, the elder, at the time of his death; that at the request of one of the executors of John Holmes, the elder, and of the family, the witness, in the year 1836, went to Virginia to examine the lands; that he took with him a map and plan and two deeds, one being the patent above mentioned for the lands in controversy, the other the deed from Samuel C. Young to John Holmes for the same lands; and that these papers had been in his possession or under his control for a period of thirty-seven or thirty-eight years. On his said visit the witness went upon the lands with Peter Fulkerson, who lived in sight of them, and who, as well as Frederick D. Fulkerson and Mr. Ewing, brother-in-law of the latter, recognized him as representing the owners of the land. It was at that time called the "Holmes plantation." There were no intruders upon the land and no one in actual possession. In 1840 Frederick D. Fulkerson treated by letter with the witness for the purchase of the land, and in 1846 James Fulkerson wrote the witness to learn the least he would take for the land, and repeated his inquiry in the year 1847. It may be here stated that the defendants claimed possession under patents issued, one to the Peter Fulkerson above mentioned, dated October 30, 1838; and another to said Frederick D. Fulkerson and James Fulkerson and Elizabeth Fulkerson, dated October 31, 1846, and by subsequent conveyances from said patentees.

Having introduced this evidence the plaintiffs rested.

One of the defences set up to the action by the defendants

was, that under the laws of Virginia the lands in controversy had been forfeited to the State, and the title by reason thereof had, *ipso facto*, reverted to the State, and was, therefore, out of the plaintiffs.

The acts of the State of Virginia applicable to the present case, providing for the forfeiture of lands delinquent for the non-payment of taxes, were as follows:

The second section of the act of February 27, 1835, after reciting, by way of preamble, that whereas it was "known to the general assembly, that many large tracts of land lying west of the Alleghany Mountains which were granted by the Commonwealth before the first day of April, eighteen hundred and thirty-one, never were, or have not been for many years last past, entered on the books of the commissioner of the revenue where they respectively lie," declared that every owner of any such tract of land should, on or before the first day of July, 1836, enter, or cause to be entered on the books of the commissioner of revenue for the county in which the lands lay, any land owned by him the title of which came through grants by the Commonwealth, and have the same charged with all taxes and damages in arrears properly chargeable thereon, and pay all such taxes and damages which had not been relinquished and exonerated by the second section of the act concerning delinquent and forfeited lands, passed March 10, 1832, and, upon failure to do so, such lands, not in the actual possession of said owner, should become forfeited to the Commonwealth after the first of July, 1836. Laws of Virginia, 1834, 1835, ch. 13, pages 11, 12.

The second section of the act of March 10, 1832, referred to in the statute just recited, provided that all taxes and damages due and chargeable on lands lying west of the Alleghany Mountains, returned delinquent for the year 1831 or any previous year, and which had not been redeemed, or exonerated by former laws, should be discharged, and the lien of the Commonwealth therefor relinquished, provided said taxes and damages did not exceed $10. See Laws of Virginia, 1832, ch. 73, pages 66, 67.

By successive acts of the Legislature of Virginia (act of

March 23, 1836, ch. 3, page 7, acts of 1835–36; act of March 30, 1837, ch. 8, page 9, acts of 1836–7; act of March 15, 1838, ch. 8, pages 16, 17, acts of 1838) the time for entering lands upon the books of the commissioners of revenue, and paying the taxes and damages charged thereon, and thereby saving them from forfeiture, was extended to the first day of July, 1838.

In order to prove the forfeiture of the land in controversy to the State of Virginia the defendants introduced "a table of tracts of land in Lee County assessed with taxes," certified on September 5, 1876, by the Auditor of Public Accounts of the State of Virginia. This table showed that three tracts of land, containing in the aggregate 6300 acres, had been listed for taxation, against Samuel Young, of Philadelphia, for the years from 1827 to 1832 inclusive. The taxes on the three tracts for the five years from 1827 to 1831 inclusive were, according to the table, unpaid, and amounted in all to 38 cents. The taxes for 1832 were marked paid.

The Auditor of Public Accounts certified that the books of Lee County prior to 1827 were missing; that the records showed that the taxes on said three tracts of Samuel Young had been paid up to and including the year 1822; that the taxes were released to 1831, inclusive; and that said lands were returned among the unascertainable lands in 1832, and subsequently dropped from the commissioners' books of Lee County.

To rebut this testimony introduced by the defendants, the plaintiffs put in evidence the certificate of the deputy sheriff of Lee County, dated December 14, 1837, to the effect that he had placed a tract of land in the name of Samuel Young, for 3000 acres, which was returned in the year 1834 not ascertainable, on the commissioners' books of said county of Lee, and taxed the damages thereon. They also introduced "an extract," certified September 5, 1875, by the Auditor of Public Accounts, "from the land books of the commissioners of the revenue for the county for Lee, for the years 1838 to 1875, both inclusive," of lands assessed successively to John Holmes, John Holmes, Jr., and John Holmes's estate, for each of said years. The extract showed that a tract of 3000 acres of land, conveyed by Samuel C. Young, was listed for taxation to John

Holmes and John Holmes, Jr., of Philadelphia, and to the estate of John Holmes, for the years above mentioned; the taxes down to 1874, excepting one year, appeared to have been paid or released by law.

The evidence having been closed, the court, at the request of plaintiffs, charged the jury as follows: "That if they believed from the evidence in the cause that the Commonwealth, by letters-patent, on the 7th day of May, 1787, granted to Samuel Young the parcel of 3000 acres of land in the declaration mentioned; that Samuel C. Young was the only child and heir of Samuel Young; that Samuel C. Young conveyed the said 3000 acres, by deed of the 12th day of July, 1819, to John Holmes, of the city of Philadelphia, Penn.; that said John Holmes was dead; and that the plaintiffs were his heirs; then the title to this land was satisfactorily traced to the plaintiffs; and that, in consequence of the antiquity of the deed of Samuel C. Young to John Holmes of 12th July, 1819, and its custody by said Holmes, the jury might be justified by the testimony tending to prove an acknowledgment of this title by those under whom defendants claim, to accept the recitals of said deed as to the heirship of Samuel C. Young."

At the request of the defendants the court charged the jury: "That the plaintiffs have attempted to show a right under Samuel Young's patent, and that they cannot derive title from Samuel C. Young, unless they prove to the satisfaction of the jury that Samuel Young's rights passed by deed, devise, or descent to Samuel C. Young, under whom the plaintiffs claim."

Having given these charges, the court refused the defendant's request to charge the jury as follows: "That the recital in the deed of Samuel C. Young, that he is the only heir of Samuel Young, has been permitted to be read to the jury as evidence; yet it is left to the jury to decide, from all the facts and circumstances in evidence before them, whether Samuel Young is dead or not, and whether Samuel C. Young is his only son and heir or not, and unless they should be clearly satisfied from the evidence that Samuel C. Young is the son and heir of Samuel Young, then they should find for the defendants."

The defendants also asked the court to instruct the jury upon the question of the forfeiture of the lands in controversy under the laws of the State of Virginia, above recited, but the court refused to instruct the jury on this point.

*Mr. John A. Buchanan* for plaintiffs in error:

I. It was error in the court to allow said deed to be read in evidence without instructing the jury that the recitals therein as to the death of Samuel Young and the heirship of Samuel C. Young were not evidence against the plaintiffs in error, even if it were admissible at all, without proof of its execution, or of possession, accompanying and held under it.

The said recitals in the deed were clearly inadmissible:

1. Because such recitals are not evidence of the facts recited as to third persons, who do not claim under, but adversely to the title which the deed purports to convey. *Wiley* v. *Givens,* 6 Gratt. 277, 286.

2. Such recitals could not be received as evidence of pedigree, because the relationship of Samuel C. Young, the declarant, to Samuel Young was not established; and it was not shown that the declarant was dead. These two facts must be shown by evidence independent of the recitals. *Blackburn* v. *Crawfords,* 3 Wall. 175, 187; 1 Wharton's Evidence, § 218, and cases cited; 2 Starkie, 205, and note; *Gregory* v. *Baugh,* 4 Rand. (Va.), 611; *Chapman* v. *Chapman,* 2 Conn. 347; *Fort* v. *Clarke,* 1 Russell, 601, 604; *Speed* v. *Brooks,* 7 J. J. Marsh. 119.

These recitals were made by Samuel C. Young in his own interest, and upon no principle of law can such acts be evidence in favor of those who claim under him, to establish the facts stated in the recitals as against these persons. *Edwards* v. *Ballard,* 14 B. Mon. 289, 290.

II. The court erred in refusing to instruct the jury upon the question of forfeiture. The forfeiture was clearly shown; but if it were not, there was evidence tending to show it, and it was the plain duty of the court, in such a case, to instruct the jury upon that question. *Farish* v. *Reigle,* 11 Gratt. 697; *Early* v. *Garland,* 13 Gratt. 1–14; *Hopkins* v. *Richardson,* 9 Gratt. 485–496.

*Mr. Patrick Hagan* and *Mr. William Pinkney Whyte* for defendants in error. *Mr. John A. Campbell* also filed a brief for same.

Mr. Justice Woods, delivered the opinion of the court. He stated the case as above reported and continued :

It is first assigned for error that the Circuit Court " allowed the deed from Samuel C. Young to John Holmes to be read in evidence without instructing the jury that the recitals therein in respect to the death of Samuel Young and the heirship of Samuel C. Young were not evidence against the defendants, even if it were admissible at all, without proof of its execution or possession accompanying and held under it."

The deed of Samuel C. Young to John Holmes was rightfully admitted in evidence, as an ancient deed, without proof by the subscribing witnesses, or of possession by the plaintiffs or those under whom they claimed. When offered it was more than sixty years old ; it was produced from the custody of the heirs of John Holmes, the grantee, who claimed the lands described therein. It, as well as the patent for the same land from the Commonwealth of Virginia to Samuel Young, was shown to have been found among the papers of John Holmes. The lands described therein were shown to have been listed for taxation to John Holmes, or to his heirs, for a period beginning with the year 1838 down to and including the year 1875, which was after the bringing of this suit ; and it appeared that during that time they had paid the taxes assessed on said lands, or the same had been released to them by law. It was further shown, that the judge before whom the acknowledgment of the deed had been made was dead ; that his signature to the certificate of acknowledgment was genuine ; that the deed had been recorded in the county where the lands lay for more than forty-two years before it was offered in evidence ; and that before and after the deed was put upon record the lands described therein were reported to be the lands of John Holmes, the grantee, and his heirs, and were known and designated in the neighborhood where they lay as the " Holmes plantation.

This state of facts amply justified the admission of the deed

in evidence, as an ancient document, without other proof. *Caruthers* v. *Eldridge*, 12 Gratt. 670; *Applegate* v. *Lexington & Carter County Mining Co.*, decided at the present term, *ante*, 255, and cases there cited.

The question is, therefore, fairly presented, whether the recitals made in the deed of Samuel C. Young to John Holmes, to the effect that Samuel Young, the patentee, had died intestate, leaving one child only, namely, the said Samuel C. Young, the grantor, were admissible in evidence against the defendants, who did not claim title under the deed.

The fact to be established is one of pedigree. The proof to show pedigree forms a well settled exception to the rule which excludes hearsay evidence. This exception has been recognized on the ground of necessity; for, as in inquiries respecting relationship or descent, facts must often be proved which occurred many years before the trial, and were known to but few persons, it is obvious that the strict enforcement in such cases of the rules against hearsay evidence would frequently occasion a failure of justice. Taylor on Evidence, ed. 1872, § 571. Traditional evidence is, therefore, admissible. *Jackson* v. *Cooley*, 8 Johns. 127; *Jackson* v. *Browner*, 18 Johns. 37; *Jackson* v. *King*, 5 Cowen, 237; *Davis* v. *Wood*, 1 Wheat. 6. The rule is that declarations of deceased persons who were *de jure* related by blood or marriage to the family in question may be given in evidence in matters of pedigree. *Jewell* v. *Jewell*, 1 How. 219; *Blackburn* v. *Crawfords*, 3 Wall. 175; *Johnson* v. *Lawson*, 2 Bing. 86; *Vowles* v. *Young*, 13 Ves. 140, 147; *Monkton* v. *Attorney-General*, 2 Russ. & Myln. 147, 159; *White* v. *Strother*, 11 Ala. 720. A qualification of the rule is, that, before a declaration can be admitted in evidence, the relationship of the declarant with the family must be established by some proof independent of the declaration itself. *Monkton* v. *Attorney-General*, 2 Russ. & Myln. 147, 156; *Attorney-General* v. *Kohler*, 9 H. L. Cas. 653, 660; *Rex* v. *All-Saints*, 7 B. & C. 785, 789. But it is evident that but slight proof of the relationship will be required, since the relationship of the declarant with the family might be as difficult to prove as the very fact in controversy.

Applying these rules, we are of opinion that the recital in the deed of Samuel C. Young to John Holmes, supported as it was by the circumstances of the case shown by the evidence was admissible, as tending to prove the facts recited, namely that Samuel Young, the patentee, was dead, and Samuel C. Young, the grantor, was his only child and heir.

As the deed in which the recital was made was entitled to be admitted in evidence, it stands upon the same footing as if its execution had been proved in the ordinary way. The fact, therefore, that, on the twelfth day of July, 1819, the date of the deed, in the city of Philadelphia, before Richard Peters, United States Judge, and two other persons as witnesses, Samuel C. Young, the grantor in the deed mentioned, made the declarations in question, may be taken as established.

It is not disputed that when, upon the trial of the case in the Circuit Court in October, 1880, the deed containing the recitals was offered in evidence, the declarant, Samuel C. Young, was dead. It only remained, therefore, to offer some evidence that the declarant, Samuel C. Young, was related to the family of Samuel Young. One circumstance relied on to show his relationship was the similarity of names. This, after the lapse of so great a time, was entitled to weight. Another fact was that the patent to Samuel Young for the land in controversy was found with the deed of Samuel C. Young to John Holmes among the papers of the latter after his death. The well-known practices and habits of men in the transfer of title make it clear that the patent was delivered to Holmes by Samuel C. Young, when the latter delivered his own deed to Holmes for the premises conveyed by the patent. There was, therefore, persuasive proof that on January 12, 1819, Samuel C. Young had in his possession, claiming it as a muniment of his title, the patent issued by the Commonwealth of Virginia to Samuel Young; and the presumption is that his possession of the patent was rightful. The fact that Samuel C. Young, representing himself to be the son and heir of Samuel Young, had in his rightful possession the title papers of the latter to a valuable estate, is a fact tending to prove the truth of his asserted relationship.

Another circumstance of weight is that Samuel C. Young, having assumed, as the son and sole heir of Samuel Young, to convey the landed estate of the latter, and his grantees having for more than sixty years claimed title under his conveyance, the right of Samuel C. Young to make the conveyance has never, so far as appears, been questioned or challenged by any other person claiming under Samuel Young.

After a lapse of sixty-one years we think these circumstances were sufficient to prove that Samuel C. Young was of the family of Samuel Young, and that the declaration of the former, deliberately made in an ancient writing, signed, sealed, witnessed, acknowledged, and recorded, to the effect that the declarant was the only child and heir of Samuel Young, and that the latter was dead, was of right admitted in evidence, as tending to prove the facts so recited. This conclusion is sustained by the case of *Deevy* v. *Gray*, 5 Wall. 795, which is directly in point. See also *Carver* v. *Astor*, 4 Pet. 1; *Crane* v. *Astor & Morris*, 6 Pet. 598; *Garwood* v. *Dennis*, 4 Binn. 314; *Stokes* v. *Daws*, 4 Mason, 268; *Jackson* v. *Cooley*, 8 Johns. 127. In view, therefore, of the circumstances of the case, there was no error in the refusal of the court to instruct the jury that said recital was not evidence against the defendants.

The next and only other ground of error alleged by the defendants is, that the court refused to charge the jury on the question of forfeiture. We think there was no error here.

The forfeiture of the lands in controversy is alleged to have occurred by virtue of the provisions of the second section of the act of February 27, 1835. Two classes of lands were declared subject to forfeiture by this act. The first was lands which had never been entered upon the books of the commissioners of revenue for the county in which the lands lay.

There is a failure to show that the lands in question had never been listed for taxation upon the books of the commissioners of Lee County, within whose limits they were included. It is true the certificate of the Auditor of Public Accounts, introduced by the defendants, states that the records of Lee County prior to 1827 are missing. But it can hardly be maintained that when a party shows his inability to prove

an essential fact, the fact may be inferred from his inability to prove it.

But the same certificate shows that the lands of Samuel Young were placed on the books of the commissioners of Lee County for six years, namely, from 1827 to 1832 inclusive, and that the taxes on the same lands had. been paid up to and including the year 1832. Upon the showing of the defendants themselves, it appears that the lands in question do not belong to the class which had never been entered upon the books of the commissioners of revenue.

Nor are the defendants any more successful in showing that the lands in controversy fell within the second class liable to forfeiture, namely, those which for many years previous to February 27, 1835, the date of the act declaring the forfeiture, had not been entered upon the books of the commissioners of revenue. For, referring to the second section of the act of March 10, 1832 (Laws of Virginia, 1832, ch. 73, p. 67), it appears that only those tracts of land on which the unpaid taxes exceeded $10 were liable to forfeiture under the act of February 27, 1835. There is no proof that the taxes and damages on the lands in question exceeded that amount. On the contrary, if the table of lands showing the taxes thereon for the years 1827 to 1832 inclusive, certified by the Auditor of Public Accounts, includes the lands in controversy, as the defendants contend, the taxes thereon for all the years stated amounted to only 38 cents, and the taxes were, therefore, released and relinquished by the second section of the act of March 10, 1832. And if this table did not include the lands in controversy, then there is an entire failure to show what the taxes were. The defendants, therefore, have failed to prove that the lands in controversy were liable to forfeiture under the act of February 27, 1835.

But there is affirmative proof that no forfeiture could have occurred, for the time for entering the lands on the commissioners' books for taxation and for paying the taxes, and thereby preventing forfeiture, was extended, as has been stated, to the first day of July, 1838, and it was shown by the certificate of Crabtree, the deputy sheriff, that as early as December 14,

1837, the lands in controversy were placed upon the tax-books and the damages thereon taxed; and it was further shown that the State of Virginia never claimed the lands as forfeited, but from the year 1838 down to the beginning of this suit, a period of more than thirty-three years, had assessed and collected taxes therefor from the plaintiffs and those under whom they claim. It follows that the failure to show a forfeiture of the lands under the act of February 27, 1835, was complete. It would, therefore, have been the duty of the court, if it gave any instruction upon this branch of the defence, to say to the jury that the defendants had failed to maintain it. It can hardly be urged by them, as a ground for the reversal of the judgment, that the court did not so charge. *Brobst* v. *Brock,* 10 Wall. 519; *Phillips Construction Co.* v. *Seymour,* 91 U. S. 646.

*Judgment affirmed.*